IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07-cv-414-MEF |
| | ) | |
| SAFETY GUIDE OF ALABAMA, LLC | ) | (WO-Not Recommended for Publication) |
| and THOMAS J. MILLS, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Whitney National Bank ("Whitney Bank") brings this action concerning certain obligations relating to an unfunded check that was presented to the bank for payment. After weighing the evidence and testimony offered by the parties during a two-day bench trial, the Court finds that judgment is due to be entered against Plaintiff Whitney National Bank on the indorser liability claim, which is pursuant Alabama Code § 7-3-415, and in favor of Plaintiff Whitney National Bank and against Defendant Thomas J. Mills on all other claims. In support of this judgment, and to resolve the pending Motion for Judgment as a Matter of Law, which was made orally by Defendant at the close of Plaintiff's evidence and renewed at the end of trial, the Court makes the following findings of fact and conclusions of law:

## I.  FINDINGS OF FACT

The Court is satisfied that the credible evidence presented in the trial of this cause supports the following findings of fact:

1.  Whitney Bank is a national bank having its main office in New Orleans, Louisiana and its place of incorporation in Louisana.

2.  Defendant Thomas J. Mills ("Mills") is a resident of Alabama residing in Montgomery County, within the Middle District of Alabama Northern Division.

3.  The parties have stipulated that Safety Guide LLC ("Safety Guide") is an Alabama limited liability company managed by Michael Marcato with it principal place of business in Montgomery, Alabama.

4.  The parties have stipulated that Highway Solutions LLC ("Highway Solutions") is an Alabama limited liability company managed by Anne Marcato with its principal place of business in Montgomery, Alabama.  Michael Marcato was employed as a consultant to Highway Solutions during the relevant time period.

5.  During the relevant time period, Highway Solutions was a site contractor that performed work for the Corps of Engineers, including a project in Fort Benning, Georgia and a levy repair project in Louisiana following Hurricane Katrina.  Highway Solutions also had an active project in Spanish Fort, Alabama.

6.  The parties have stipulated that Michael Marcato and Anne Marcato (together, the "Marcatos") are husband and wife.

2

7.  The parties have stipulated that from approximately April 2006 to April 2007, Mills was employed by both Safety Guide and Highway Solutions, simultaneously, as a comptroller and/or treasurer, and generally oversaw the corporate financial affairs of both entities.

8.  The parties have stipulated that, on January 7, 2005, Highway Solutions executed and delivered to Whitney Bank a depositor account agreement and opened an account at Whitney Bank's Montgomery, Alabama branch.  This bank account is referred to hereinafter as "the Whitney Account."

9.  In addition to the Whitney Account, Highway Solutions had a line of credit with Whitney Bank.  Between January, 2005 and March 1, 2007, Whitney Bank worked with Highway Solutions to modify the term, amount, and interest rate on the line of credit to accommodate the changing financial condition of Highway Solutions.

10.  After the line of credit expired on March 1, 2007, Whitney Bank continued to negotiate with Highway Solutions, hoping that the two could continue their business relationship.

11.  Safety Guide maintained a checking account with Wachovia corporation.

12.  Michael Marcato, Anne Marcato, and Michael Marcato's mother were the only persons authorized to sign checks drawn on Safety Guide's Wachovia account.

13.  The week of March 5, 2007, employees of Highway Solutions were attempting to cash payroll checks which had been drawn on the Whitney Account.  These payroll checks

and other checks drawn on the Whitney Account were also presented to Whitney Bank for payment that week.

14. Whitney Bank dishonored at least forty (40) checks presented to the Whitney Account between March 5, 2007 and March 9, 2007 due to insufficient funds,

15. In addition, a check (number 9165), dated March 2, 2007 and in the amount of $80,000.00, was written from Highway Solutions to Safety Guide. The $80,000.00 check was presented to the Whitney Account on March 5, 2007 and was dishonored by Whitney Bank on March 6, 2007.

16. A second check (number 9271), dated March 8, 2007 and also in the amount of $80,000.00, was written from Highway Solutions to Safety Guide. This second $80,000.00 check was presented to the Whitney Account on Friday March 9, 2007 and was dishonored by Whitney Bank on Monday March 12, 2007.

17. On Friday, March 9, 2007, Mills attended a meeting in Georgia that was also attended by, among others, a representative of McKnight Construction Company, Inc. ("McKnight Construction"). Mills expected to receive at the meeting a check made payable to Highway Solutions in an amount in excess of $475,000.00 for work Highway Solutions had performed as a subcontractor for McKnight Construction. Although Safety Guide had also performed work as a subcontractor for McKnight Construction, no payment to Safety Guide was expected to be made on or about March 9, 2007.

18. At the March 9, 2007 meeting, McKnight Construction refused to release any payment to Highway Solutions.

4

19.  On the afternoon of Friday, March 9, 2007, after the conclusion of the meeting, Mills called Gene Crane of Whitney Bank ("Crane") and reported that McKnight Construction had withheld payment from Highway Solutions.  Mills further explained to Crane that because no payment was made to Highway Solutions at the March 9, 2007 meeting, Highway Solutions had nothing to deposit to the Whitney Account in order to cover the outstanding checks, including the numerous payroll checks.

20.  Mills asked Crane what could be done and Crane indicated that nothing could be done.  Crane explained that Whitney Bank would not honor the checks unless there were sufficient funds on deposit in the Whitney Account.

21.  On March 12, 2007, at 7:39 am, Mills contacted Crane to inform him that Highway Solutions would have a $150,000.00 deposit to the bank by 10:00 am.

22.  The parties have stipulated that on Monday, March 12, 2007, Mills delivered a check to Highway Solutions and deposited the check into the Whitney Account.  That check, numbered 19670 and drawn on Safety Guide's Wachovia checking account, was dated March 12, 2007.  It was for the amount of $150,000.00 and made payable to Highway Solutions. This document will hereinafter be referred to as "the Check."

23.  Above the line for the authorized signature on the front of the Check, Mills signed Michael Marcato's signature as the maker of the Check.

24.  The parties stipulated at trial that Mills signed Michael Marcato's signature as the maker of the Check without Michael Marcato's authority or permission.

25.  The back of the Check bears the words "For Deposit Only" in the space reserved

5

for endorsements. Mills wrote these words on the back of the check in order to deposit the Check into the Account.

26. Mills knew that sufficient funds were not in the Safety Guide account with Wachovia to cover the Check at the time he (a) delivered the Check to Highway Solutions, and (b) deposited the Check into the Account.

27. The parties have stipulated that Mills delivered the Check to Highway Solutions and deposited the Check into the Account, despite knowing funds were not in the Account to cover the Check, because funds were needed in the Account to pay debts owed to third parties.

28. Crane spoke with Mills on Monday, March 12, 2007, after the deposit of the Check had been made but before the balance was credited to the account. Mills told Crane that the funds to cover the Check consisted of "family money." Crane understood Mills' use of the term "family money" to mean that Anne Marcato or someone in her family was providing a loan or financial assistance to Highway Solutions.

29. After the Check was deposited and Mills and Crane spoke about the source of the money, the Whitney Account was credited for $150,000.00, the amount of the Check.

30. If Crane had known or had reason to believe that there was no money in Safety Guide's Wachovia account to cover the Check, he would have frozen the Whitney Account, suspending all activity until further investigation.

31. Because Whitney Bank believed that the Check was good, however, Whitney Bank subsequently honored checks and other debits presented to the Account. Among the

honored checks was the second $80,000.00 check (number 9271), which had been presented for payment by Wachovia a second time.

32.  On Monday, March 19, 2007, Crane was notified that Wachovia had dishonored the $150,000.00 Check.  The Check's dishonor caused the Whitney Account to be overdrawn in the amount of $150,815.23.

33.  As per Whitney Bank's normal procedure when checks are dishonored, Crane directed that the Check be run through the Federal Reserve a second time.

34.  The parties have stipulated that before midnight of the next banking day following the banking day on which Whitney Bank received notice of the Check's dishonor, Whitney Bank notified Mills of the Check's dishonor and also mailed notice to Highway Solutions.

35.  During a telephone conversation on March 19, 2007, Crane informed Mills that the Check had been dishonored.  Mills told Crane that he would contact Wachovia and resolve the problem.

36.  Later that same day, Mills explained to Crane that the funds to cover the Check written on Safety Guide's Wachovia account were to be provided by Mills, through the sale of his personally owned securities.  However, Mills said that he tried to sell the securities through a stop order, but that the conditions necessary for the execution of the order were not met.  As a result the transaction never consummated.  Mills told Crane that Mills would issue a new sale order, that the check would be honored by Wachovia, and that Whitney Bank should re-present the Check.

37.  Wachovia dishonored the Check a second time, and Whitney Bank received the check from the Federal Reserve.

38.  The parties have stipulated that as a result of the checks and other debits that were posted to the Whitney Account and paid by Whitney Bank after the Check's deposit, the subsequent dishonor of the Check caused the Whitney Account to be overdrawn.  During the period the $150,000.00 was credited to the Account, Whitney Bank honored checks and debits that left the account overdrawn by $149,699.23.   No other deposits were made to the Whitney Account.

39.  Prior to the dishonor of the Check, Highway Solutions had never before made a deposit to the Whitney Account that was dishonored.

40.  Mills was fired by Safety Guide and Highway Solutions for his actions in connection with the Check.

41.  The parties have stipulated that on May 11, 2007, Whitney Bank filed its complaint, commencing the instant lawsuit against Safety Guide and Mills seeking, without limitation, damages caused as a result of the Check that was deposited with Whitney Bank and later dishonored by Safety Guide's bank.

42.  The parties have stipulated that also on May 11, 2007, Whitney Bank filed its complaint against Highway Solutions and the Marcatos in the United States District Court for the Middle District of Alabama, Northern Division, seeking, without limitation, damages caused as a result of (a) the overdrawn Account, (b) Highway Solutions' breach of multiple

8

promissory notes it executed in favor of Whitney Bank, and (c) amounts owed to Whitney Bank by the Marcatos pursuant to commercial guaranties executed by the Marcatos.

43.   The parties have stipulated that on June 10, 2007, the Marcatos filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama.

44.   The parties have stipulated that on July 12, 2007, Safety Guide filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama.

45.   The parties have stipulated that on September 26, 2007, Highway Solutions filed for bankruptcy in the United States District Court for the Middle District of Alabama.

46.   The parties have stipulated that Whitney Bank has incurred attorneys' fees and costs of  collection in the amount of $10,000.00.  They have also stipulated this amount is reasonable and necessary.

47.   Finally, the parties stipulated that interest on $149,699.23 at the annual rate of six percent (6%) is $8,981.9538 per year, $748.4962 per month, and $24.6081 per day, based on a 365 day year.

## II. CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

48.   For purposes of 28 U.S.C. § 1332, Whitney Bank is a citizen of Louisiana and Mills is a citizen of Alabama.

49.   The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332.

50.   The Court has personal jurisdiction over Mills.

51.   Venue is appropriate pursuant to 28 U.S.C. §§ 1391(a)(1) & (2).

**B.  The Automatic Stay Applicable to the Marcatos, Safety Guide, and Highway Solutions Does Not Apply to Mills**

52.  As a threshold issue, the Court finds that this action is not barred by the bankruptcy filings of the Marcatos, Safety Guide or Highway Solutions.  Except in rare cases, the automatic stay imposed by 11 U.S.C. § 362(a)(1) applies only to proceedings against the debtor in bankruptcy.  The Fifth Circuit Court of Appeals has explained:

> The automatic stay takes effect under 11 U.S.C. § 362(a)(1) upon the filing of a petition in bankruptcy and acts to stay any judicial "proceeding against the debtor."  Its purposes are to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse. . . . By its terms the automatic stay applies only to the debtor, not to co-debtors . . . nor to co-tortfeasors.

*GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985) (citing and quoting *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544 (5th Cir. 1983)).

53. As one frequently cited case articulated, the automatic stay "does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtors."  *In re Advanced Ribbons & Office Prods., Inc.*, 125 B.R. 259, 263 (9th Cir. B.A.P. 1991); *see also In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 246 (9th Cir. 1994) (noting that bankruptcy "does not stay actions against guarantors"); *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1364 (Fed. Cir. 1990) (holding same); *In re The Russell Corp.*, 156 B.R. 347, 350 (Bankr. N.D. Ga. 1993) (refusing to extend the automatic stay to guarantors, noting that "Congress intended the automatic stay of section § 362 to protect the debtor . . . . It was not designed to benefit third parties . . . . Congress did not enact a codebtor

10

stay in Chapters 7 and 11").

54.  The United States District Court for the Southern District of New York has noted

that courts in the Second Circuit "regularly[] refuse to extend a debtor corporation's § 362(a)

stay to its non-debtor officers and principals."  *Gucci, Am., Inc. v. Duty Free Apparel, Ltd.*,

328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004).  However, the automatic stay may be imposed

against a non-bankrupt party "when such an identity of interest exists between the debtor and

third party non-debtor that a judgment against the third party will directly affect the debtor."

*Id.* (citing *In re North Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y. 1991) (in turn

citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).  "Specifically,

where a particular action against the non-debtor party threatens to adversely affect the

debtor's reorganization efforts, courts are willing to extend § 362(a)'s coverage

accordingly."[1]  *Id.* (citing *In re United Health Care Org.*, 210 B.R. 228 (S.D.N.Y. 1997)

(staying actions against two non-debtor defendants where debtor corporation's successful

reorganization was contingent upon the contribution of defendants' personal assets and

efforts)).

55.  Extending the automatic stay beyond the bankruptcy debtor, however, is reserved

for "special circumstances" and typically applies "to those lawsuits which threaten serious

risk to a reorganization in the form of immediate adverse economic consequences for the

---

[1] For example, *Gucci* explained that where "the threatened harm may adversely affect needed debtor funds (e.g., when non-debtors are entitled to indemnification) or personnel (e.g., when debtors need the services of non-debtors facing crushing litigation)," the debtor protection requires the an exception to the usual limited scope of the stay.  *Id.* at 441 n.1 (citing *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y. 1999)).

11

debtor's estate." *Id.* at 442 (citing *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)). The Fifth Circuit Court of Appeals acknowledged that the automatic stay may be extended to non-debtors where a formal tie or contractual indemnification creates the identity of interests between the debtor and the non-debtor. *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001) (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). However, *Arnold* refused to extend the automatic stay to a co-defendant of a Chapter 11 debtor in multiple asbestos actions because the court found "no formal tie or contractual indemnification to create such an identity of interests." *Id.*

56.   The Court finds that there are no "special circumstances" in this lawsuit threatening to adversely affect Safety Guide's reorganization efforts. There is no formal tie or contractual indemnification creating an identity of interests between Mills and Safety Guide. Rather, Plaintiff claims, and the Court holds below, that Mills is independently liable to Whitney Bank for violations of Alabama law.

## X. Indorser Liability: Ala. Code § 7-3-415

57.  If an instrument is dishonored, section 7-3-415 of the Alabama Code requires an indorser to pay the amount due on the instrument, according to the terms of the instrument at the time it was indorsed, to the person entitled to enforce it.

58.  The Alabama Supreme Court recognized this obligation before section 7-3-415 was codified:

> A regular and unqualified indorser engages that on due presentment it (the instrument) shall be accepted or paid, or both, as the case may be, according

12

to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder or to any subsequent indorser who may be compelled to pay it.

*Guttery v. Kilgore*, 172 So. 627, 628 (Ala. 1937) (citing *Scarbrough v. City Nat'l Bank*, 48 So. 62, 63 (Ala. 1908)).

59.  Section 7-3-415 of the Alabama Code states:

(a) . . . if an instrument is dishonored, an indorser is obliged to pay the amount due on the instrument . . . according to the terms of the instrument at the time it was indorsed . . . . The obligation of the indorser is owed to a person entitled to enforce the instrument or to a subsequent indorser who paid the instrument under this section.

. . . .

(c) If notice of dishonor of an instrument is required by Section 7-3-503 and notice of dishonor complying with that section is not given to an indorser, the liability of the indorser under subsection (a) is discharged.

ALA. CODE § 7-3-415.

60.  Under section 7-3-301 of the Alabama Code, a "[p]erson entitled to enforce an instrument means . . . the holder of the instrument."  ALA. CODE § 7-3-301.

61.  Whitney Bank is the holder of the Check pursuant to the Alabama Code and is therefore the person entitled to enforce it.  ALA. CODE §§ 7-4-205, 7-1-201(b)(21).

62.  The obligation of the indorser to pay the amount due on the Check pursuant to section 7-4-415 of the Alabama Code is therefore owed to Whitney Bank.

63.  The Alabama Code states that section 7-3-415(a) may not be enforced unless the indorser is given notice of the instrument's dishonor.  ALA. CODE § 7-3-415(c).

13

64.  The parties stipulated the before midnight on the next banking day following the banking day on which Whitney Bank received notice of the Check's dishonor, Whitney Bank notified Mills of the Check's dishonor.  Crane testified that this notice was in the firm of a phone call on Monday, March 19, 2007.

65.  The parties also stipulated that before midnight on the next banking day following the banking day on which Whitney Bank received notice of the Check's dishonor, Whitney Bank mailed notice to Highway Solutions.

66.  As specified in section 7-3-503(b) of the Alabama Code, notice of dishonor may be given by "any commercially reasonable means, including an oral, written, or electronic communication; and is sufficient if it reasonably identifies the instrument and indicates that the instrument has been dishonored or has not been paid or accepted."

67.  The Court finds that proper notice of the Check's dishonor was given to Mills.

68.  Section 7-3-204(a) of the Alabama Code defines "indorsement" as "a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument."

69.  The instrument in question here, the Check, clearly bears the words "for deposit only," which are made for the purpose of restricting payment on the Check, but the space reserved for indorsements does not contain any other words.

70. Whitney Bank has urged this Court to find that Mills' writing of the words "for deposit only" on the back of the Check met the requirements of Alabama Code §§ 7-3-204 & 7-3-415.

71. "Signed" is defined to include "using any symbol executed or adopted with present intention to adopt."  ALA. CODE § 7-1-201(b)(37).  The Official Comments to the Alabama Code specify that the symbol "may be printed, stamped or written; it may be by initials or by thumbprint" and most importantly that "the court must use common sense and commercial experience in passing upon these matters.  The question always is whether the symbol was executed or adopted by the party with present intention to adopt or accept the writing."  ALA CODE § 7-1-201 cmt. 37.

72. While it is undisputed that Mills wrote the words "for deposit only" on the back of the Check, the Court finds that there is no credible evidence that Mills' signature appears on the Check as an indorser because there is no evidence that Mills placed these words there with the present intention to adopt or accept the writing such that the words should be considered his signature.  First, Mills did not testify at trial, so there was no direct evidence that he intended to adopt the words "for deposit only" as his signature.  Second, there was no indirect evidence presented that Mills intended to adopt the words "for deposit only" as his signature.  Third, common sense and commercial experience dictate that when one writes "for deposit only," but omits any other words or symbols such as one's name, that person does not intend to sign the check or create a restricted indorsement.  To the contrary, when only the words "for deposit only" are written, there exists a restriction, but no indorsement.

73.  Mills' liability to Whitney Bank pursuant to Alabama Code § 7-3-415 requires proof that Mills is an "indorser."

74.  Alabama Code § 7-3-204 provides that an "indorser" is one who makes an "indorsement" which means "a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument" for certain enumerated purposes.

75.  The clear, common sense reading of this statutory language precludes a finding that, given the facts before this Court, the words "for deposit only" are Mills' signature. Therefore, Mills is not an indorser of the Check.

76.  Accordingly, Mills is entitled to judgment on Whitney Bank's claim against him under § 7-3-415 of the Alabama Code.

### X.  Civil Worthless Check Act: Ala. Code § 6-5-285

77.  Under Alabama law, the "holder of a worthless check . . . [has] a right of action against the person who unlawfully made, uttered or delivered" the check.  ALA. CODE § 6-5-285 (the "Civil Worthless Check Act").

78.  Whitney Bank is the "holder" of the Check because it is the depository bank that took the Check for collection and because it is the person in possession of the Check who is entitled to enforce it.  ALA. CODE §§ 7-4-205, 7-1-201(b)(21).

79.  In order to succeed on its claim under the Civil Worthless Check Act, Whitney Bank must prove three elements: (1) drawing [uttering or delivering] the check, (2) with intent to defraud, (3) knowing that there are insufficient funds to cover the check. *Smith v.*

*S.E. Fin. Corp.*, 337 So. 2d 330, 333 (Ala. 1976).

80.  The parties have stipulated that Mills (i) delivered and deposited the Check, and that (ii) at the time he delivered  and deposited the Check, he knew that funds were not in Safety Guide's Wachovia account to cover the Check.

81.  The parties also stipulated that Mills was not among the people authorized to sign checks drawn on Safety Guide's Wachovia account.  The parties further stipulated that Mills signed Michael Marcato's signature as the maker of the Check without Michael Marcato's authority or permission.

82.  Regarding the "intent to defraud element," Alabama law holds that a showing at trial that the check had been presented and that payment had been refused, either for insufficient funds or because the depository on which the check was drawn does not exist, is prima facie evidence of the intent to defraud.  *Tolbert v. State*, 321 So. 2d 227, 230 (Ala. 1975).

83.  Based on the credible evidence, the Court finds that the Check was presented and that Wachovia refused payment of the Check because of insufficient funds.

84.  The Court additionally finds that the credible evidence established that on March 12, 2007, when Mills made, delivered, and deposited the Check, Mills knew that Safety Guide did not expect to receive a payment to cover the Check.  In fact, by the time of the conclusion of the Meeting on Friday, March 9, 2007, no payment was expected to be made even to Highway Solutions.

85.  The Court finds that no course of dealing existed between Whitney Bank and

Mills that could have given rise to a reasonable belief that the Check would be honored.

86. Credible evidence shows that Whitney Bank previously honored numerous unfunded checks drawn on the Whitney Account and allowed the Account to be overdrawn. Whitney Bank stopped honoring unfunded checks drawn on the Whitney Account on Monday, March 5, 2007, however.

87. The evidence also shows that during the week of March 5, 2007, Whitney Bank dishonored forty or more checks. This was immediately before Mills deposited the Check, and Mills was fully aware of the dishonor of these checks. Additionally, the honor or dishonor of these checks is unrelated to how Whitney Bank would treat the Check, which was not written on the Whitney Account. Rather, it was written on Safety Guide's Wachovia account, and therefore the course of dealing with Whitney Bank is irrelevant. Moreover, Highway Solutions had never deposited a check that was dishonored before Mills deposited the Check.

88. In sum, there is no evidence of a course of dealing by Whitney Bank to disregard the dishonor of deposited checks.

89. Therefore, because Whitney has shown prima facie evidence of Mills' intent to defraud, and because Mills has failed to demonstrate any reasonable belief that the Check would be paid upon presentation, the Court finds Mills liable to Whitney Bank under the Alabama Civil Worthless Check Act.

## X.  Fraudulent Misrepresentation and Suppression

90. Fraud is the false representation of a material existing fact, inducing reasonable reliance, and causing damages. *Green Tree Acceptance, Inc. v. Doan*, 529 So. 2d 201, 206 (Ala. 1988) (citing ALA. CODE § 6-5-101).

91.  In order to recover damages for fraud, a plaintiff must show that: (a) the defendant made a false representation; (b) concerning a material existing fact; (c) upon which the plaintiff reasonably relied; and (d) as a proximate result, the plaintiff suffered damages. *See, e.g.*, *Dickinson v. Moore*, 468 So. 2d 136, 137-38 (Ala. 1985); *see also Intercorp, Inc. v. Pennzoil Co.*, 877 F. 2d 1524, 1534 (11th Cir. 1989).

92.  The Court finds based upon the evidence that when Mills made, delivered, and deposited the Check, Mills represented to Whitney Bank that the Check would be honored. *See Youngblood v. Bailey*, 459 So. 2d 855, 858, 860 (Ala. 1984) (affirming that the defendant perpetrated a fraud by the giving of a check as payment, fraudulently representing that her bank account had sufficient funds to cover the check); *see also Elliot v. Caheen Bros.*, 153 So. 613, 615 (Ala. 1934) (stating that the "use of a check known to be bad, with no bona fide belief that it will be honored, as a subterfuge to get goods on credit, while the seller believes it to be the equivalent of a cash transaction, is a fraud.").

93.  That representation was false based on the Court's finding that Mills knew (a) there were no funds in Safety Guide's Wachovia account to cover the Check, and (b) no payment would be made to Safety Guide soon thereafter.

94.  The Court additionally finds that Mills falsely represented to Whitney Bank that

the source of the funds to cover the Check consisted of "family money" when Mills spoke with Crane on Monday, March 12, 2007, after depositing the Check.

95.   The evidence further shows that Mills again affirmatively mislead Whitney Bank on March 19, 2007 by representing that he (a) sold personal securities to cover the Check, and that he (b) would resolve the dishonored Check with Wachovia.

96.   The representations made to Whitney Bank by Mills were material.

97.   There was credible evidence in this case that Whitney Bank would not honor the checks posting to the Account unless sufficient funds were deposited to cover them.  The evidence showed that over forty checks presented to the Whitney Account were returned due to insufficient funds in the week prior to Mills' deposit of the Check.

98.   There was evidence that Mills knew that Whitney Bank would rely upon his false representation because he had asked Crane what could be done regarding the lack of funds in the Whitney Account and the number of outstanding checks and Crane indicated that nothing could be done.

99.   Crane testified credibly that had Mills been truthful on Monday, March 12, 2007 regarding the source of the funds to cover the Check, Crane would have frozen the Whitney Account pending further investigation.

100.   The Court additionally finds that Whitney Bank's reliance that the Check would be honored was reasonable, in part because Highway Solutions had never deposited a check that was dishonored.

101.   It was demonstrated that Whitney Bank suffered damages as a proximate result

of the false representations made by Mills and the Whitney Bank's reliance on those false representations.

102.  Honoring the checks presented to the Whitney Account as a result of the Check's deposit and the statements by Mills directly and proximately caused Whitney Bank to suffer damages in the amount of $149,699.23, plus costs of collection, including attorney fees.

103.  The concealment by Mills that there was no money in Safety Guide's Wachovia account to cover the Check also constitutes fraudulent suppression.

104.  In order to establish a cause of action for fraudulent suppression, a plaintiff must show that: (a) the defendant had a duty to disclose material facts; (b) the defendant concealed or failed to disclose those facts; (c) the concealment of failure to disclose induced the plaintiff to act or refrain from acting; and (d) the plaintiff suffered actual damage as a proximate result. *See, e.g.*, *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288, 1293 (Ala. 1993).[2]

105.  A defendant's duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information.  *Dodd*, 626 So. 2d at 1293.  However, mere silence is not fraudulent in the absence of a duty to disclose.  *Id.*

_____

[2] In addition, one can be liable for suppression only of a fact of which one has knowledge.  *Id.* at 1292; *see also Johnson v. Sorensen*, 914 So. 2d 830, 837 (Ala. 2005).  It is undisputed that Mills knew, at all relevant times, that there was no money in Safety Guide's Wachovia account to cover the Check.

106.  A plaintiff may also recover by showing "active concealment of a material fact with an intent to deceive or mislead." *Id.* at 1293-94.

107.  As explained above, Whitney Bank was proximately damaged as a result of the suppression by Mills of the material facts regarding the Check.

108.  The Court finds that Mills had a duty to disclose to Whitney Bank the truth about the Check because of (a) the relationship between the parties; (b) the particular circumstances (including the prior conversation between Mills and Crane on Friday, March 9, 2007 and Whitney Bank's accommodation of the strained financial condition of Highway Solutions and Safety Guide); and (c) the statements Mills made to Crane about Anne Marcato's "family money," which were made in response to a request for information.

109.  The Court further finds that Mills had a duty to correct the misrepresentations he made when he delivered and deposited the Check, knowing it would not be honored.

110.  As demonstrated by the stipulations by the parties and the evidence offered at trial, Mills did not disclose the truth about the Check, Whitney Bank's lack of information caused it to honor the Check and to allow the withdrawals, and Whitney Bank was damaged in the amount of $149,699.23, plus costs of collection, including reasonable attorney fees.

111. Therefore, because Whitney Bank has proven the elements of both fraud and fraudulent suppression, the Court finds Mills liable to Whitney Bank for fraud under Alabama law.

## X. Punitive Damages

112.  Under Alabama law, punitive damages may be awarded in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.  ALA. CODE § 6-11-20.  Only fraud that is "gross, oppressive, or malicious" can support punitive damages.  *Id.* § 6-11-20(b)(1).

113.  The Alabama Civil Worthless Check Act also provides that the plaintiff may recover compensatory and punitive damages, as the jury or court trying the case may assess. ALA CODE § 6-5-285.

114.  Whitney Bank requested that this Court enter an award of punitive damages in favor of Whitney Bank of $50,000.00.

115.  The evidence in this case showed that Mills negotiated a single worthless check and perpetrated a fraud, but only with respect to that single check.  There was no evidence at trial to show that Mills sought to benefit personally from his conduct.  There was no evidence of an ongoing scheme to defraud or of wantonness, oppression, or of a malicious intent on the part of Mills against Whitney Bank.  Moreover, there was not clear and convincing evidence presented that the fraud that did in fact occur was gross, oppressive or malicious.

23

116.  Therefore, the Court finds that punitive damages are not appropriate in this case under either the Civil Worthless Check Act or the punitive damages statute applicable to tort actions for fraud.

## X.  Attorneys' Fees

117.  The parties have stipulated that Whitney Bank incurred costs of collection, specifically attorneys' fees, in the amount of $10,000.00.  They have also stipulated these fees are reasonable and necessary.

118.  In light of these stipulations, and because of the credible evidence presented at trial, the Court finds that Whitney Bank is entitled to recover $10,000.00 from Mills under the Civil Worthless Check Act.

## X.  Prejudgment Interest

119.  Under Alabama law, prejudgment interest is allowable at the legal rate in non-contract cases where the damages can be ascertained by mere computation, or where the damages are complete at a given time so as to be capable of determination at such time in accordance with known standards of value.  *Nelson v.  AmSouth Bank, N.A.*, 622 So.2d 894, 895-96 & n.1 (Ala.  1993).

120.  The tort damages in this case allow for prejudgment interest because of the ease and certainty with which the damages can be ascertained and the certain point in time at which they occurred.

121.  Whitney Bank is therefore entitled to prejudgment interest on its compensatory

damages of $149,699.23 at six percent (6%) interest, beginning on April 1, 2007 to the date of the judgment's entry.

122.   The parties stipulated that interest on $149,699.23 at the annual rate of six percent (6%) is $8,981.9538 per year, $748.4962 per month, and $24.6081 per day, based on a 365 day year.

123.   The amount of prejudgment interest as of November 1, 2008 was therefore $14,969.92 (based on 20 months at $748.4962 per month), with a per diem of $24.61.

## CONCLUSION

Consistent with this Memorandum Opinion and Order, the Court will enter a written final judgment in favor of Defendant Thomas J. Mills and against Plaintiff Whitney National Bank on the claim pursuant Alabama Code § 7-3-415 and in favor of Plaintiff Whitney National Bank and against Defendant Thomas J. Mills on all other claims.

DONE this the 21st day of November, 2008.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE